**NOT FOR PUBLICATION IN WEST'S HAWAI‘I REPORTS AND PACIFIC REPORTER**

**Electronically Filed**
**Intermediate Court of Appeals**
**CAAP-21-0000010**
**23-FEB-2022**
**07:33 AM**
**Dkt. 109 SO**

NOS. CAAP-21-0000010 AND CAAP-21-0000011

IN THE INTERMEDIATE COURT OF APPEALS

OF THE STATE OF HAWAI‘I

IN THE INTEREST OF KD1 AND KD2
(CASE NO. FC-S 17-0093K)

AND

IN THE INTEREST OF AW
(CASE NO. FC-S 17-0095K)

APPEAL FROM THE FAMILY COURT OF THE THIRD CIRCUIT
(KONA DIVISION)

SUMMARY DISPOSITION ORDER
(By: Ginoza, Chief Judge, Leonard and McCullen, JJ.)

Appellant Mother (**Mother**) appeals pro se from: (1) the Order Granting Motion to Terminate Parental Rights, and Denying Mother's Motion for Reunification filed on December 8, 2020, in FC-S No. 17-0093K; and (2) the Order Granting Motion to Terminate Parental Rights, and Denying Mother's Motion for Reunification filed on December 8, 2020, in FC-S No. 17-0095K, which were both

filed in the Family Court of the Third Circuit (**Family Court**).[1] On July 30, 2021, the Family Court entered an Amended Order Granting Motion to Terminate Parental Rights and Denying Mother's Motion for Reunification, which adjudicated a request to amend the court's prior orders (**Amended Order**); no appeal was filed from the Amended Order.

In FC-S No. 17-0093K, Mother's parental rights to two of her children (**KD1** and **KD2**) were terminated. In FC-S No. 17-0095K, Mother's parental rights to a third child (**AW**) were terminated.

On appeal, Mother does not state points of error in compliance with applicable rules (see Rule 11(a) of the Rules Expediting Child Protective Appeals), but contends that: (1) there was a lack of facts and circumstances required to establish the Family Court's original jurisdiction under Hawaii Revised Statutes (**HRS**) §§ 587A-5 (2018) and 571-11(9) (Supp. 2020); (2) Petitioner-Appellee the State of Hawaiʻi, Department of Human Services (**DHS**), failed to provide reasonable efforts to prevent removal of the children and reunify the family; (3) there was not clear and convincing evidence Mother was not presently willing and able to provide a safe family home, even with the assistance of a service plan; (4) there was not clear and convincing evidence it was not reasonably foreseeable Mother would become

---

[1]     The Honorable Joseph P. Florendo, Jr. presided.

willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time; (5) citing In re T.M., 131 Hawaiʻi 419, 319 P.3d 338 (2014), Mother disputes that "[t]he Court has provided Mother and Father with adequate legal representation;" (6) the Family Court erred by finding the permanent plan was in the best interest of her children; and (7) Findings of Fact (**FOFs**) A, C2, G, G4, I, J, L, Z, BB, DD, and EE and Conclusions of Law (**COLs**) 1, 2, 5, and 6 are erroneous.

The challenged FOFs and COLs are as follows:

FINDINGS OF FACT

A) The Court finds that the Department has presented clear and convincing evidence that:

1) [KD1] and [KD2]'s legal mother, legal father, adjudicated, presumed, or, concerned father as defined under HRS Ch. 578 are willing, but not presently able to provide the children with a safe family home, even with the assistance of a service plan, and,

2) It is not reasonably foreseeable that [KD1] and [KD2]'s legal mother, legal father adjudicated and presumed, or concerned father as defined under HRS Ch. 578 will become willing and able to provide the children with a safe family home, even with the assistance of a service plan within a reasonable period of time, **which shall not exceed two (2) years from the children's date of entry into foster care** (emphasis added);

3) [AW]'s legal mother, legal father, adjudicated, presumed, or, concerned father as defined under HRS Ch. 578 are willing, but not presently able to provide the children with a safe family home, even with the assistance of a service plan, and,

4) It is not reasonably foreseeable that [KD1] and [KD2]'s legal mother, legal father adjudicated and presumed, or concerned father as defined under HRS Ch. 578 will become willing and able to provide the children with a safe family home, even with the assistance of a

service plan within a reasonable period of time, **which shall not exceed two (2) years from the children's date of entry into foster care** (emphasis added);[2]

. . . .

C) Less than a month later, on January 3, 2018, the Department of Human Services (hereinafter DHS) filed a Supplemental Safe Family Home Report,

. . . .

2) On February 27, 2018 Joan Jackson, who was appointed to represent Mother appeared in court, however Mother failed to appear;

. . . .

G) The court has provided Mother and Father with adequate legal representation;

. . . .

4) Mother failed to appear at a hearing on February 27, 2018;

. . . .

I) Mother was subsequently placed on deferred status on August 20, 2018, however because she violated the terms of her deferred sentence by testing positive for methamphetamine eight (8) times between December 2018 and March 2020, her deferred status was revoked and she was convicted and placed on probation on March 6, 2020[4];

[4] Testimony of Wendy Mitchell

J) On or about January 29, 2019 Mother was discharged from Lokahi Outpatient Treatment program because she failed to show up for a random test on August 13, 2018, tested positive for methamphetamine on November 13, and December 20, 2018, and failed to abide by a "last chance behavioral contract", further inpatient residential treatment was recommended[5];

[5] Supplemental Safe Family Home Report filed January 29, 2019.

. . . .

L) Mother completed the Access Capabilities outpatient program in May 2020, however, the Department of Human Services does not find that Mother's completion of

---

[2/] Paragraph 4) refers to KD1 and KD2, instead of AW, by mistake. This error was corrected in the Amended Order.

this outpatient program satisfies the Service Plan's requirement of an in-patient recovery program[9]; (footnote 8 omitted)

> [9] Testimony of Tina Haalilio see also February 23, 2020 Safe Family Home Report which includes a December 19, 2019 Memo from Dr. Christopher Au of Access wherein he opines: "... a stint of residential care should give her the structure and starting point for lifelong sobriety. Due to her emotional stressors outpatient may not be the most appropriate level of care without at least a month of sobriety under her belt."

. . . .

Z) The earliest that Mother would be able to complete the required inpatient substance abuse counseling, which the DHS would require prior to reunification, would be six (6) months from the date of the hearing on this matter, and more than two (2) years from the date that children entered foster care; (footnote omitted)

. . . .

BB) All three (3) children have improved behaviors and are doing well in their respective placements;

1) Freida Pavao, [AW]'s resource care giver, testified that [AW] is no longer taking medications, that her tantrums have stopped, and the lack of in-person visits with Mother have led to improved behavior overall;

2) Maile Pavao, [AW]'s mental health therapist, reports that [AW] is no longer taking medications, and her behavior has improved;

3) [AW] requires a structured, consistent environment;

. . . .

DD) The proposed Permanency Plan, which is attached hereto as Exhibit "A" is in the best interests of the children;

EE) Under the circumstances that are presented in this case, DHS has made reasonable efforts to finalize the permanency plan which in this care is permanent out of home placement; (footnote omitted).

. . . .

CONCLUSIONS OF LAW

1) DHS has proven by clear and convincing evidence that Mother and/or Father, while they may be willing, are

5

not presently **able** to provide the parent's children with a safe family home, even with the assistance of a service plan; and [(emphasis added)]

2) That while Mother and Father may be willing, it is not reasonably foreseeable that the Mother and/or Father, whose rights are subject to termination, will become **able** to provide the children with a safe home, even with the assistance of a service plan, within **two (2) years from the children's date of entry into foster care** [(emphasis added)];

. . . .

5) It is in the best interests of the children, who are ages 5, 7, and 10, that they be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home;

6) The proposed permanency plan is in the best interests of the children[.]

Upon careful review of the record and the briefs submitted by the parties and having given due consideration to the arguments advanced and the issues raised by the parties, we resolve Mother's contentions as follows:

(1) Mother contends that the Family Court erred in its invocation of jurisdiction in the March 13, 2018 Orders Establishing Family Court Jurisdiction filed in FC-S Nos. 17-0093K and 17-0095K. The Family Court found, *inter alia*, that "[t]here exists an adequate basis to invoke Family Court jurisdiction. . . . Jurisdiction is based on harm and threatened harm to the children due to parental substance abuse, domestic violence, and the failure to cooperate with voluntary services." Mother argues that "[t]he ultimate question is whether, on the record before the court, there was evidence that the family court found that the child's physical or psychological health or welfare had been harmed or was subject to threatened harm by the

6

acts or omissions of the child's family."  Mother argues that "[w]ithout having a signed affidavit from a credible witness, any relevant hearsay is inadmissible as evidence in any ruling."

It appears that the Family Court continued the temporary foster custody hearings in both cases several times until its determination and invocation of jurisdiction on March 13, 2018.  Mother does not point to where in the record she objected on the basis of hearsay or lack of a signed affidavit, the record on appeal does not contain transcripts from the December 21, 2017, January 3, 2018, February 7, 2018, and March 13, 2018 hearings that preceded the courts invocation of jurisdiction, and nothing in the court's minutes indicate that an evidentiary objection was raised.  Therefore, we conclude that this argument was waived.  See Hawaiʻi Rules of Appellate Procedure (**HRAP**) Rule 28(b)(4); see also Bettencourt v. Bettencourt, 80 Hawaiʻi 225, 230, 909 P.2d 553, 558 (1995).

Mother also disputes the change from family supervision of KD1 and KD2 to foster custody on June 5, 2018, due to alleged drug use and pending criminal charges for three counts of Promoting a Dangerous Drug in the Third Degree, one count of Promoting a Detrimental Drug in the Third Degree, and one count of Drug Paraphernalia, on the grounds that she was denied her right to a contested hearing, and that the Family Court erred by granting temporary foster custody on June 12, 2018, because

"[t]he Children were never in imminent danger, or at risk of harm."

However, the record indicates that on June 12, 2018, Mother objected to foster custody and a contested hearing was scheduled. The record further indicates that a contested hearing on foster custody was held on November 16, 2018. Transcripts for the June 12, 2018 hearing, and the November 16, 2018 contested case hearing are not in the record on appeal. Therefore, this court is unable to review Mother's arguments that the children were not in imminent danger or at risk of harm. See Bettencourt, 80 Hawai'i at 230, 909 P.2d at 558.

Mother further argues that no investigation was done to determine whether it was necessary or advisable to take KD1 and KD2 into custody. See HRS § 587A-11 (2018) ("Upon receiving a report that a child is subject to imminent harm, has been harmed, or is subject to threatened harm, and when an assessment is required by this chapter, the department shall cause such investigation to be made as it deems to be appropriate.") However, a Safe Family Home Report, dated December 13, 2017, provided a history of DHS's involvement with the family and explained the reason for assuming temporary foster custody of KD1 and KD2. The family was in Voluntary Case Management, Mother cancelled six appointments for a substance abuse assessment, between February 28, 2017 and July 31, 2017, Mother did not show up to five drug tests and tested positive once for amphetamines

and methamphetamines.  Father was referred for a substance abuse assessment in April of 2017, but did not complete it until August 2017 and was a no-show for six out of eight drug tests between January 27, 2017 and September 20, 2017.  On October 10, 2017, DHS received a call alleging Mother was using and dealing methamphetamines.  On October 11, 2017, DHS was informed Mother was minimally compliant with Voluntary Case Management services and Father did not participate at all.  On October 27, 2017, a DHS social worker met with Mother and Father in person and questioned them about participating in services.  Mother stated that missed and rescheduled appointments were difficult to attend; however, neither parent was employed at the time.  Mother denied using drugs and claimed she never used methamphetamine, despite a prior positive test for methamphetamine.  On November 9, 2017, a DHS social worker called Mother to follow up about missed appointments for KD2 to be evaluated for Early Intervention Services, but Mother responded that she was not worried about her children's well-being or development.  Mother was informed her case was being elevated because she was not participating in services and needed to exhibit more responsibility for her children's well-being, but DHS did not hear back from Mother.  On December 8, 2017, two DHS social workers made an unannounced visit to the family home and observed, *inter alia*, that KD2, who was only two years old at the time, was wandering around the yard strewn with trash and debris.

9

KD1 and KD2 were then taken into protective custody; Mother was arrested on an outstanding warrant. Thus, the record demonstrates that Mother's argument is without merit.

(2) Mother contends that DHS failed to provide reasonable efforts to prevent removal of the children on June 5, 2018, and to reunify the family.[3] Mother appears to refer to HRS § 587A-26(c)(2)(A) (2018) which requires the Family Court to consider whether DHS "made reasonable efforts to prevent or eliminate the need for removing the child from the child's family home before the child was placed in foster care" to challenge continued temporary foster custody after June 5, 2018.

In a Supplemental Safe Family Home Report, dated June 8, 2018, DHS explained its reasoning for removing KD1 and KD2 from family supervision and placing them into temporary foster custody. DHS stated that on June 1, 2018, a caller informed DHS that Mother was arrested "for dealing meth," a drug raid was conducted at the family residence, Mother was in custody, and KD1 and KD2 were at home with Father. The caller also reported Mother and Father fought daily and that the children were "malnourished, as the parents are on meth." DHS deemed the family home to no longer be safe and was unable to risk leaving the children in the home due to Mother's arrest on drug charges, the fact that neither parent notified DHS of Mother's arrest, and

---

[3] Only KD1 and KD2 were taken into temporary foster custody on June 5, 2018.

that Father allowed Mother back into the family home after she was placed on supervised release. DHS considered leaving the children in the family home but concluded that the risk was unacceptable because drugs were present in the home where both parents resided, Mother had been arrested on drug charges related to the home, neither parent informed DHS of the drug-related charges, and both parents continued to reside in the family home after Mother's arrest. DHS could not prevent or eliminate the need to remove the children from the family home due to Mother's and Father's conduct. Therefore, the Family Court did not err by continuing temporary foster custody.

DHS did not fail to provide Mother with a reasonable opportunity to reunify with the children. "DHS is under an obligation to provide a reasonable opportunity to parents through a service plan to reunify the family." In re Doe, 100 Hawaiʻi 335, 343, 60 P.3d 285, 293 (2002) (interpreting HRS Chapter 587, the predecessor to HRS Chapter 587A). After the Family Court adjudicated jurisdiction on March 13, 2018, Mother and Father were ordered to follow an Interim Family Service Plan, and then on August 28, 2018, Mother and Father were ordered to follow a Family Service Plan, dated August 13, 2018. "[A] claim for additional services and accommodations must be timely made." Id. at 344, 60 P.3d at 294. Mother does not point to where in the record she raised the issue of DHS's lack of reasonable efforts to reunify her with the children or requested additional or

11

different services, and we find nothing in the record to support this argument.  Therefore, we conclude that Mother's argument is without merit.

(3)  The record supports the conclusion that there was clear and convincing evidence Mother was not presently willing and able to provide a safe family home, even with the assistance of a service plan.  HRS § 587A-33(a)(1).  As discussed, DHS initially petitioned for temporary foster custody of the children in December 2017 due to Mother using and/or dealing methamphetamine, minimal compliance with Voluntary Case Management services, and no-shows for drug testing.  At the time of trial on DHS's Motions to Terminate Parental Rights in November 2020, Mother's remaining safety issue was drug use. Mother's probation officer, Wendy Mitchell (**Mitchell**) testified that although Mother completed outpatient treatment in May 2020, Mother admitted to using methamphetamine on June 17, 2020. Mother tested positive for methamphetamine on December 3 and 13, 2019, and January 21, February 26, June 17, and October 9, 2020. A DHS social worker, Tina Haalilio (**Haalilio**) testified Mother had three no shows for drug tests since June 2020, which are considered positives.  Mother's inability to parent while using methamphetamine resulted in the children being neglected, not being fed properly, appearing dirty and disheveled, and having behavioral issues.  In addition, even when Mother tested positive she did not accept the result and made excuses why it could be a

12

mistake.  For nearly three years, Mother failed to address the safety concerns stemming from her drug use.  Therefore, we conclude that the Family Court did not err by finding Mother could not presently provide a safe family home, even with the assistance of a service plan.

(4)  There was clear and convincing evidence it was not foreseeable Mother would become willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time, not to exceed two years from the date the children entered foster care.  AW entered foster care on February 6, 2018, and KD1 and KD2 entered foster care on June 5, 2018.  Among other things, Haalilio testified that due to Mother's substance abuse safety issues, Mother would need an additional six months from November of 2020 to be ready to create a safe family home.  Accordingly, it was not reasonably foreseeable Mother would become willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time, not to exceed two years from the date the children entered foster care.

(5)  Citing In re T.M., Mother disputes that "[t]he Court has provided Mother and Father with adequate legal representation."  Mother claims she was not appointed counsel prior to the initial hearing on the petition for temporary foster custody of KD1 and KD2 in December 2017 as required by In re T.M.

In In re T.M., 131 Hawaiʻi at 436, 319 P.3d at 355, the Hawaii Supreme Court held: "We direct that upon the filing date of this opinion, trial courts must appoint counsel for indigent parents upon the granting of a petition to DHS for temporary foster custody of their children." In In re L.I., 149 Hawaiʻi 118, 122, 482 P.3d 1079, 1083 (2021), the court clarified "that In re T.M. mandated that family courts appoint counsel for indigent parents when DHS files a petition asserting custody over a child."

Here, in FC-S No, 17-0095K, the initial temporary foster custody hearing on December 21, 2017, was continued and was further continued on January 3, 2018, until after Mother completed an application for court-appointed counsel and established she was indigent and was granted court-appointed counsel on January 4, 2018. Therefore, Mother's right to counsel was not violated in FC-S No. 17-0095K.

In FC-S No. 17-0093K, on December 15, 2017, during the initial temporary foster custody hearing, court minutes indicate that Mother acknowledged she was given an application for court-appointed counsel, and the Family Court offered to continue the proceeding so counsel could be appointed. Mother admits that "Mother declined the court's recommendation to continue the matter at a further hearing in order for Mother to receive an appointment of counsel." Court minutes of December 21, 2017, indicate Mother was again advised that she had a right to counsel

and to let the Family Court know at any time if she would like to invoke that right all she needed to do was fill out an application and if she qualified she would be appointed counsel. Court minutes of January 3, 2018, indicate the Family Court "would like to afford the parents an attorney before granting [Temporary Foster Custody]." Court minutes of June 12, 2018, indicate that Mother's court-appointed counsel in FC-S No. 17-0095K stated Mother was not asking for counsel in FC-S No. 17-0093K, but nevertheless wanted the children to be returned that day and would contest foster care. Counsel stated she was only appointed in FC-S No. 17-0095K, and Mother just told her "maybe she should represent herself." The Family Court noted that Mother and Father had the right to counsel and can fill out an application and the matter would be continued, or they could go forward without counsel; the court suggested they get counsel. Although Mother did not state she wanted counsel, the Family Court continued the matter to July 3, 2018. Court minutes of July 3 2018, indicate that the Family Court again recommended parents be represented by an attorney, Mother and Father stated they would like to proceed without an attorney, the Family Court then advised them their testimony could be used against them and Mother had a pending criminal drug case, but Mother indicated she would still like to go forward. Further into the hearing, the Family Court again advised Mother she needed to consult with an attorney and that if she wanted one and could not afford one that

15

one would be appointed for her. Court minutes of August 14, 2018, indicate that Mother's counsel in FC-S No. 17-0095K stated parents have chosen to be pro se in FC-S No. 17-0093K and the Family Court again advised them of their right to be represented by an attorney. Court minutes of October 23, 2018, indicate that Mother asked her court-appointed attorney in FC-S No. 17-0095K to withdraw. Court minutes of November 16, 2018, indicate Mother did not object to the withdrawal of her counsel and that after the Family Court advised Mother of her right to be represented by an attorney, Mother indicated she did not want an attorney at that time. The Family Court then advised Mother of her right to an attorney in the future. On July 18, 2019, the Family Court appointed counsel for Mother in both cases after she completed an Application for Court-Appointed Counsel on July 18, 2019.

The record clearly demonstrates Mother was advised of her right to counsel multiple times, the Family Court recommended Mother obtain counsel multiple times, Mother did not request counsel be appointed in FC-S No. 17-0093K, Mother refused to continue hearings so counsel could be appointed, and the record in FC-S No. 17-0093K did not demonstrate that Mother was indigent until she completed an application for appointment of counsel, after which she was immediately appointed counsel at her request. We conclude that the Family Court did not fail to timely appoint counsel for Mother in either case.

(6)     The Family Court did not err by finding the permanent plan was in the best interest of the children.  At a termination of parental rights hearing, the court shall determine whether there exists clear and convincing evidence that "[t]he proposed permanent plan is in the best interests of the child." HRS § 587A-33(a)(3) (2018).  The permanent plan shall state whether the permanency goal will be achieved through adoption, legal guardianship, or permanent custody.  HRS § 587A-32(a)(1) (2018).  In deciding if the proposed permanent plan is in the best interest of the child, the Family Court must "[p]resume that it is in the best interests of the child to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home" and must "[g]ive greater weight to the presumption that the permanent plan is in the child's best interest, the younger the child is upon the child's date of entry into foster care[.]"  HRS § 587A-33(a)(3)(A) and (B).

Here, the April 30, 2020 Permanency Plans for the children recommended the permanency goal of adoption.  Although Mother makes several arguments in conjunction with this point of error, none relate to whether adoption, legal guardianship, or permanent custody is in the best interest of the children. Mother does not point to any evidence in the record that would be sufficient to rebut the presumption that it is in the best interest of the children to be promptly and permanently placed

17

with responsible and competent substitute parents and family in a safe and secure home.  We conclude that Mother's challenge to the permanent plan is without merit.

(7)  Mother contends that FOFs A, C2, G, G4, I, J, L, Z, BB, DD, and EE, and COLs 1, 2, 5, and 6 are erroneous.  As discussed above, FOF A is not clearly erroneous because there was clear and convincing evidence Mother was not presently willing and able to provide a safe family home, even with the assistance of a service plan, and it was not reasonably foreseeable Mother would become willing and able to provide a safe family home, even with the assistance of a service plan, within a reasonable period of time.

FOFs C2 and G4 are clearly erroneous to the extent they state that Mother failed to appear for a hearing on February 27, 2018.  A February 27, 2018 Order Continuing Return Hearing for All Three Children indicated that Mother was present for a hearing on February 27, 2018.  However, such error is harmless because it does not appear that the Family Court based any order or decision on the erroneous finding of fact.  As discussed above, Mother was provided with adequate legal representation, therefore, FOF G is not otherwise clearly erroneous.

Mother provides no argument as to why FOF I and J are erroneous.  Therefore, those points of error are waived.  See HRAP Rule 28(b)(7).

18

Mother objects to FOFs L and Z due to their characterization that Mother's service plan required "inpatient" substance abuse treatment. The record indicates Mother's service plans required her to participate in any recommended treatment or one approved by DHS and that two service providers recommended Mother participate in residential treatment. However, there is nothing in the record that equates residential treatment with inpatient treatment. Therefore, it appears that, to the extent FOFs L and Z state Mother was required to participate in inpatient substance abuse treatment, they are erroneous. However, any such error is harmless. Mother does not contend that she completed a residential substance abuse treatment program or that her completion of Access Capabilities was either a recommended treatment or approved by DHS. Mother did not complete the recommended substance abuse treatment as required by her service plans. Moreover, Mother's substance abuse was unresolved almost two and a half years after the children entered foster care. Therefore, any error in FOFs L and Z did not affect the Family Court's determination that Mother was not presently willing and able to provide a safe family home, even with the assistance of a service plan.

Mother contends that FOF BB, which found the children were doing well in their respective placements, is erroneous because according to the record the children are not doing well and "the reports have demonstrated the opposite of improved

19

behaviors, at a consistent decline." AW's resource caregiver testified that when AW first came to her she threw major tantrums and lied a lot but since being with her it lessened and there were no incidents in the past five months. AW's therapist testified AW stopped using medication over the past few months, AW seemed more in touch with her feelings now, AW was doing better with issues of stealing and lying more recently, AW's behavior recently improved and there was consistent change in her behavior, and AW needed consistency and would not do well with unstructured time. An Initial Mental Health Evaluation that assessed KD2 on June 18, 2020, stated that KD2's resource caregiver reported that KD2 "made drastic improvements in the past two years that he lived with her," but he was still a challenge. The Fourth Report of Guardian Ad Litem, dated February 26, 2020, reported that KD1 was happy living with the resource caregiver, felt safe, liked everything about living there, did chores, loved school, was doing well in school, and school staff had no concerns about KD1's attitude or behavior. We conclude that the record supports FOF BB. Thus, it is not clearly erroneous.

Mother contends that FOF DD, which found the proposed permanency plan was in the best interest of the children, is erroneous because the Family Court failed to find Mother was unfit and the best interest standard does not apply. As stated above, the Family Court must find by clear and convincing

evidence "[t]he proposed permanent plan is in the best interests of the child."  HRS § 587A-33(a)(3).  Therefore, the best interest of the child standard applies.  Contrary to Mother's claim, the Family Court is not required to specifically find that a parent is unfit when terminating parental rights.  HRS § 587A-33.

Mother contends FOF EE, which found DHS made reasonable efforts to finalize the permanency plan, is erroneous because she was not provided with the services needed for reunification.  As discussed above, Mother's claim regarding lack of a reasonable effort to reunify is without merit.

Mother argues that COLs 1 and 2 are erroneous based upon the same arguments in challenging FOF A.  For the same reasons as stated above, we conclude that COLs 1 and 2 are not erroneous.

Mother argues that COL 5, which concluded it was in the children's best interest to be promptly and permanently placed with responsible and competent substitute parents and family in a safe and secure home, is erroneous because the outcome of the hearing would not change the children's placement, the children need to be placed back home with their family, the Child Protective Act, Social Security Act Title IV, and Adoption and Safe Families Act all agree that the best interest of the child is with parents when safe and appropriate, Mother is the only one who should decide what is in the best interest of the children,

21

the October 26, 2020 Proposed Permanent Plan is not in compliance with the Child Protective Act because it does not have a permanent placement for AW, and a DHS social worker reported false information.  The only cogent argument Mother makes in support is that she, and not the Family Court, determines what is in the best interest of the children, which is clearly contrary to HRS § 587A-33(a)(3), which requires the Family Court to make such a determination.  Therefore, Mother's argument is without merit.

Mother contends that COL 6, which concluded that the proposed permanency plan was in the best interest of the children, is erroneous because the Family Court was without clear and convincing evidence that Mother was unable to provide a safe family home.  As discussed above, there was clear and convincing evidence Mother was not presently willing and able to provide a safe family home.  Therefore, Mother's claim is without merit.

For these reasons, we affirm the Family Court's (1) Order Granting Motion to Terminate Parental Rights, and Denying Mother's Motion for Reunification filed on December 8, 2020, in FC-S No. 17-0093K; and (2) Order Granting Motion to Terminate

Parental Rights, and Denying Mother's Motion for Reunification filed on December 8, 2020, in FC-S No. 17-0095K.

DATED: Honolulu, Hawaiʻi, February 23, 2022.

On the briefs:

Sylvia Alicia Viera, *Pro Se*,
Mother-Appellant.

Charles H. McCreary IV,
Patrick Pacual,
Julio Herrera,
Ian Tsuda,
Deputy Attorneys General,
for Petitioner-Appellee
 Department of Human Services.

/s/ Lisa M. Ginoza
Chief Judge

/s/ Katherine G. Leonard
Associate Judge

/s/ Sonja M.P. McCullen
Associate Judge